**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ESTATE OF JOHN SWAIN, et al., | No.  2:25-CV-0469-DMC |
| Plaintiffs, | |
| v. | ORDER |
| COUNTY OF TRINITY, et al., | |
| Defendants. | |

Plaintiffs, who are proceeding with retained counsel, bring this civil action. Pursuant to the written consent of all parties, this case is before the undersigned as the presiding judge for all purposes, including entry of final judgment.  See 28 U.S.C. § 636(c).  Pending before the Court is Plaintiffs' unopposed motion for approval of a minors' compromise.  See ECF No. 27.

The Court has a special duty, derived from Federal Rule of Civil Procedure 17(c), to safeguard the interests of litigants who are minors in the context of proposed settlements.  See Dacanay v. Mendoza, 573 F.3d 1075, 1080 (9th Cir. 1978); see also Robidoux v. Rosengren, 638 F.3d 1177, 1181 (9th Cir. 2011); E. Dist. Cal. Local Rule 202(b) ("No claim by or against a minor. . . may be settled or compromised absent an order by the Court approving the settlement or compromise").  As the Ninth Circuit has explained, district courts should "limit the scope of their review to the question whether the net amount distributed to each minor plaintiff in the settlement

1

is fair and reasonable, in light of the facts of the case, the minor's specific claim, and recovery in similar cases." Robidoux, 638 F.3d at 1181-82. This determination is made "without regard to the proportion of the total settlement value designated for. . . plaintiff's counsel." Id. at 1182.

This Court's local rule governing minor's compromises requires the parties to make disclosures regarding the minors involved, the nature of the controversy, the manner in which the compromise was determined, and whether a conflict of interest may exist between the minor and the minor's attorney. See Local Rule 202(b)-(c). More specifically, an application for approval of a minor's compromise must disclose the following: the age and sex of the minor; the nature of the causes of action to be settled or compromised; the facts and circumstances out of which the causes of action arose, including the time, place, and persons involved; the manner in which the compromise amount or other consideration was determined, including such additional information as may be required to enable the Court to determine the fairness of the settlement or compromise; and, if a personal injury claim, the nature and extent of the injury with sufficient particularity to inform the Court whether the injury is temporary or permanent. See Local Rule 202(b)(2). Finally, where the minor is represented by counsel, the application shall disclose: by whom and the terms under which the attorney was employed; whether the attorney became involved in the application at the insistence of the party against whom the causes of action are asserted, directly or indirectly; whether the attorney stands in any relationship to that party; and whether the attorney has received or expects to receive any compensation, from whom, and the amount. See Local Rule 202(c).

## I. BACKGROUND

### A.    Plaintiffs' Allegations

In their motion for approval of a minors' compromise, Plaintiffs outline the following factual allegations:

> John Swain was 35 years old at the time of his death on January 8, 2024. The decedent left behind two children, 14-year-old L.S. and 12-year-old J.S.

///

2

### 1.    Jail Construction

On June 13, 2019, the County of Trinity ("County") entered into a construction agreement with the Sletten Construction Company ("Sletten") to build the Trinity County Correctional Facility (the "jail"), located at 701 Tom Bell Road, Weaverville, CA 96093. Sletten subcontracted with McCarley & Son Painting, Industrial Coatings, Inc. ("McCarley") to complete certain aspects of the construction agreement. Sletten and McCarley had a contractual duty to construct the jail in accordance with a construction plan requiring application of Sikadur-23 pick-proof epoxy sealant to lighting fixtures in all jail cells but the jail was built using non-conforming sealant products in and around light fixtures. Specifically, pick-resistant caulking was improperly installed in approximately two-thirds of the jail's cells, where pick-proof caulking was required. As a result, the pick-resistant caulking could be removed from the area between a light fixture and the ceiling, exposing open gaps between lights fixtures to steel decking on the ceiling which could be used as an anchor-point, for example, to engage in self-harm. In 2022, the jail was opened following its construction.

### 2.    Aron Lewandowski's In-Custody Death

On February 26, 2023, 44-year-old Aron Lewandowski suffered brain-death at the jail. Lewandowski was an inmate with a documented history of mental health issues who was housed in the jail's segregated housing unit, A Dorm, in which he was able to commit suicide without detection by jail staff. Lewandowski hung himself with a bedsheet which he anchored to a gap in his cell's light fixture located on the ceiling, after he used a pen to remove the pick-resistant caulking from the light fixture.

After Lewandowski's death, sheriff Tim Saxon contacted Lionakis, the firm which designed the jail, and informed the firm that a jail inmate was able to "deliberately remov[e] sealant at detention light fixture and do[] self-harm." On May 3, 2023, county project specialist (and former county jail commander) Peter Braga and Steve Knapp, a Sletten representative, conducted a site-visit at the jail to inspect caulking and light fixtures. During the site-visit, Braga and Knapp inspected the light fixtures in each of the jail's dorms and cells and reported that several fixtures contained defects, including defective caulking and open seams around light fixtures which could be used as anchor points. Specifically, Braga reported the following defects on a "Security Caulking Site Survey":

(a)    Dorm A had defects in seven of eight cells, including: A101 (defective caulking on light fixture); A103 (defective caulking on light fixture); A104 (defective caulking on light fixture, and open seam around light fixture); A201 (defective caulking on light fixture, and open seam around light fixture); A202 (defective caulking on light fixture, and open seam around light fixture); A203 (defective caulking on light fixture, and "large" open seam around light fixture); and A204 (defective caulking on light fixture, and "large" open seam around light fixture). [footnote 3 omitted].

(b)    Dorm B had defects in seven of eight cells, including: B101 (defective caulking on light fixture); B102 (defective caulking on light fixture); B103 (defective caulking on light fixture); B104 (defective caulking on light fixture); B201 (defective caulking on light fixture, and open seam around light fixture); B202 (open seam around light fixture);

and B204 (defective caulking on light fixture).

(c)    Dorm C had defects in one of eight cells, including: C203 (open seam around light fixture).

(d)    Dorm D had defects in two of four cells, including: D101 (open seam around corner); and D202 (open seam around light fixture).

Sheriff Saxon, Braga, and Sletten failed to act to repair the known caulking and light fixture defects in the jail.

### 3.    John Swain's In-Custody Death

John Swain suffered from a documented disability including bipolar disorder with suicidal ideation and substance abuse disorder. Swain's disability history including mental health issues which were frequently and extensively documented in records when he was incarcerated including when he was a prisoner in the California Department of Corrections and Rehabilitation for more than a year and when he was an inmate at the Trinity County Sheriff's Office facilities on approximately 10 occasions prior to his death.

On January 4, 2024, Swain was arrested and booked as a pre-trial detainee into the Trinity County Correctional Facility. Swain was suffering from the effects of methamphetamine use and addiction including experiencing symptoms of paranoia, psychosis, and delusions. Around 5:28 p.m., correctional deputy Michael Woodson reported conducting a "Medical Screening" wherein Swain answered the question "Do you have any known mental health issues?" with "Yes." Around 5:35 p.m., Woodson reported conducting an "Inmate Medical Pre-screening" wherein Swain answered the question "Do you now have or have you ever had Psychiatric Problems?" with "Yes." Around 5:42 p.m., Woodson reported conducting a "TCU Drug Screen 5" wherein Swain answered the question "Which drug caused the most serious problem during the last 12 months (choose one)?" with "Stimulants – Amphetamines (speed)"; "How often did you use Stimulants - Amphetamines (speed) during the last 12 months?" with "Daily"; "How often did you use Stimulants - Methamphetamines (meth) during the last 12 months?" with "Daily" and "LAST TIMES USED WAS 0430 01/04/2024"; "How serious do you think your drug problems are?" with "Considerably"; and "How important is it for you to get drug treatment now?" with "Extremely." Woodson did not notify medical or mental health staff related to Swain's booking or mental health needs.

Swain was not evaluated by any medical or mental health professional, yet, Swain continued to exhibit symptoms of his disability while incarcerated. During his incarceration, Swain requested jail staff to provide him with medications to treat his disability, including bipolar and sleeping disorders. In response, jail staff told Swain that he would have to "wait" until medical or mental health professionals evaluated him before he could receive treatment including medications. Swain was booked into the jail on a Thursday, and would not receive access to mental health services until, at the earliest, Wednesday, due to the jail's practice and the Trinity County Behavioral Health Services and director Connie Smith's policy of providing healthcare services to inmates only once-a-week.

Swain was classified and housed in D Dorm, cell D202. Swain was housed in the same area of the jail as inmate Steven Raines. On a prior occasion, Swain had provided a statement to Sheriff's Office detective Joshua Ford about an assault for which Raines was currently incarcerated

4

at the jail. Around 6:40 p.m., correctional deputy Michael Coiner-Wilson reported in a "Discipline Action Report" that two inmates, Dawson Patrick and Raines, entered Swain's cell and began to assault him, including "grab[bing]" him, "pull[ing] him off the top bunk," and "striking [him] repeatedly." Patrick and Raines' assault reportedly occurred "within the last hour" of when Swain arrived in D Dorm. Coiner-Wilson reported that he moved Swain and Patrick to A Dorm, and Raines remained in D Dorm. Coiner-Wilson re-assigned Swain housing in A Dorm, cell A204, a solitary cell. A Dorm was designated as the jail's administrative segregation area where inmates are on a 23-hour lockdown with one-hour out per-day. Cell A204 presented multiple suicide risks, including anchor points (defective caulking around a light fixture creating a large open seam) and items from which a ligature/noose could be fashioned (bedsheets).

On January 5, 2024, around 2:49 p.m., Woodson reported in a "Disciplinary Action Report" that Swain was "yelling and swearing" at Patrick—an inmate who physically assaulted Swain one day earlier—and, after being ordered locked-down in his cell, Swain "continued to yell," "slammed his cell door," and "start[ed] kicking or striking the door over and over again." Woodson reportedly placed Swain on a "24-hour lockdown" and noted that "this was the third time today … Swain [was] being loud and disrespectful." Woodson reported in an "Adjudication Report for Inmate 403" that Swain was subject to the following "Sanctions": "Loss of tablets for five (5) days"; "Loss of yard for two (2) scheduled days"; and "loss of visiting for two (2) scheduled days."

On January 8, 2024, around 7:48 a.m., correctional deputies William Gaffney and Nicholas Aslin entered A Dorm with a medical cart to perform "morning medical pass." Around 7:53 a.m., Swain's cell was unlocked and he exited his cell to approach the medical cart. Gaffney informed Swain that he would be attending a court hearing later in the afternoon at 1:30 p.m. Swain asked whether he would be permitted to shower before the court hearing and Gaffney responded that he would not. Swain asked Gaffney whether he "enjoyed holding an innocent person against their will." Swain returned to the top tier of A Dorm and began "yelling something." Gaffney did not hear what was said by Swain. Gaffney told Swain to lockdown in his cell and he complied.

Gaffney and Aslin were responsible for supervising and monitoring A Dorm, including Cell A240 where Swain was housed, including through closed-circuit television (CCTV) monitors. Around 8:32 a.m. and for several minutes thereafter, Swain was visible on the CCTV video feed through the window of cell A204. Swain could be seen crossing the path of the window multiple times, including while looking up at the defective light fixture in his cell and holding a white bedsheet in his hand. Around 8:37 a.m., Swain was visible on the CCTV video feed with a white bedsheet around his shoulders and neck. Swain used the bedsheets in his cell to fashion a makeshift ligature/noose which he anchored to the defective light fixture in his cell. Swain hung himself by the neck using the bedsheets anchored to the defective light fixture.

Around 9:06 a.m., Gaffney and Aslin entered A Dorm to conduct direct-view safety checks of the cells. Gaffney checked the bottom tier and Aslin checked the top tier of A Dorm. Around 9:07 a.m., Aslin discovered Swain's hanging body in his cell. Aslin called down to Gaffney that Swain was hanging inside of his cell. Gaffney instructed Aslin to not open the door to Swain's cell due to "safety reasons." Gaffney ascended the stairs to the top tier and opened Swain's cell. Gaffney cut the sheet from which

5

Swain was hanging from the light fixture. Gaffney radioed for assistance and a medical response after Swain had been cut-down from the light fixture. Around 9:08 a.m., Gaffney began performing cardiopulmonary resuscitation (CPR) on Swain. About one minute and 36 seconds separated the time from when Aslin observed Swain hanging in his cell to when Gaffney began CPR. Emergency medical personnel arrived at the scene at took-over resuscitation efforts. Swain could not be revived through resuscitation efforts. At 9:34 a.m., Swain was declared dead. Swain's cause of death was reported as "Ligature Asphyxiation."

On January 26, 2024, the Sheriff's Office contracted with Sletten to perform a work estimate for repair of the defective caulking and light fixtures and, on March 28, 2024, contracted with Sletten to perform the repairs.

### 4.    Grand Jury Report

On December 10, 2024, the 2024 Trinity County Civil Grand Jury published a report on "Deaths at the Trinity County Correctional Facility." Therein, the grand jury investigated the in-custody death of Swain and reported: "Death and Light Fixtures [¶] Almost a year before the death of Mr. Swain, Aron Lewandowski was found unresponsive in his cell on February 26, 2023. After being transferred from the Trinity County Correctional Facility to Mercy Medical Center in Redding, California, Mr. Lewandowski would later be pronounced dead. The Trinity Journal reported the death in an article on March 22, 2023 titled 'Suspect in February Stabbing Dies of Apparent Suicide', but gave no details regarding the method. [¶] During the course of the 2024 Trinity County Civil Grand Jury's investigation, it was learned via Trinity County Sheriff's Department incident reports 23-00207 and 24-00038 that both Mr. Lewandowski and Mr. Swain committed suicide in similar manners. Both individuals were able to hang themselves by passing a bedsheet through the gap between the cell's light fixture and the ceiling. Mr. Lewandowski was housed in cell A104 and Mr. Swain was housed in cell A204. [¶] Upon discovery of the unresponsive Mr. Lewandowski and Mr. Swain during an hourly head check, correctional officers promptly entered the cells, lowered each to the floor, and began chest compressions. Medical calls went out. Responding agencies included Trinity Life Support, Weaverville Volunteer Fire Department, and CalFire. [¶] Following the death of Mr. Lewandowski, correctional staff brought in representatives from a construction company to perform a site visit on May 3, 2023. The representatives examined the state of the light fixtures in the cells. Several fixtures were noted as having an open seam around the fixture with some having a large open seam, including in cell A204, which would later house Mr. Swain. It wasn't until January 26, 2024, 12 days after the death of Mr. Swain and 8 months after the initial assessment, that construction company employees returned to perform a work estimate. All lights were subsequently repaired by March 28, 2024, 10 months after the initial assessment. Had the light fixture in cell A204 been repaired before January 8, 2024, Mr. Swain may have been prevented from hanging himself as described earlier. [¶] As reported in the Trinity Journal on June 12, 2024, a wrongful death lawsuit in connection to Mr. Lewandowski's death has been filed against Trinity County. It is unknown at this time the fiscal impact this lawsuit will have on Trinity County. * * * Findings [¶] F1. Failure to fix identified suicide hazards contributed to the death of Mr. Swain while at the Trinity County Correctional

Facility.  * * * Recommendations [¶] R1. The 2024 Trinity County Civil Grand Jury recommends that the Trinity County Sheriff's Department, in cooperation with the County Administrator's Office and the Board of Supervisors, develop a policy by June 1, 2025 that prioritizes the remediation of hazards at the Trinity County Correctional Facility when those issues are identified." 2024 Trinity County Civil Grand Jury, *Deaths at the Trinity County Correctional Facility* (Dec. 10, 2024), available at: <https://www.trinitycounty.org/569/2024-Grand-Jury-Reports-Responses>.

### 5.    Internal Affairs Investigation

To date, the Sheriff's Office and sheriff Saxon have failed to complete an investigation, make findings, and impose discipline against officials responsible for the preventable death of Swain.

ECF No. 27-1, pgs. 4-10.

### B.    **Procedural History**

Plaintiffs initiated this action with a complaint filed on February 5, 2025.  See ECF No. 1.  Defendants filed their answer on April 8, 2025.  See ECF No. 7.  The Court conducted a scheduling conference on July 30, 2025, and issued a scheduling order on August 5, 2025.  See ECF No. 15.  Pursuant to the parties' stipulation, Plaintiffs filed a first amended complaint on October 2, 2025.  See ECF No. 19.  On December 18, 2025, the Court granted Plaintiffs' unopposed motion for leave to file a second amended complaint.  See ECF No. 23.  Plaintiffs' second amended complaint was filed the same day.  See ECF No. 24.

The parties attended a settlement conference on January 5, 2026, before retired Magistrate Judge Kendall J. Newman.  See ECF No. 27-1, pg. 10.  The parties reached terms of a proposed settlement agreement contingent upon approval of public entities and this Court's resolution of a motion for approval of a minors' compromise.  See id.

### C.    **Terms of the Settlement**

As set forth in the declaration of Plaintiffs' counsel, the terms of the settlement are as follows:

5.    The contingent settlement agreement provides that each L.S. and J.S. will receive a gross settlement of $712,500 and a net settlement of $496,114.27. L.S. and J.S.'s settlement funds will be used to purchase a structured annuity that will provide for monthly maintenance payments until they reach age 18, at which time they will receive the balance of the settlement funds. L.S. and J.S.'s mother Carrie Patton will use the children's monthly funds to provide essential maintenance and

> opportunities, including for education, transportation, housing, medical and dental care, and hobbies and interests. (A true and correct copy of a statement prepared by Carrie Patton is attached as **Exhibit A**.)
>
> 6. Based on a quote, the $496,114.27 net settlement is anticipated to pay-out $545,265.76 to L.S. and $585,727.68 to J.S., after annuitization. (A true and correct copy of an annuity quote obtained by counsel is attached as **Exhibit B**.)

ECF No. 27-2, pg. 2.

## II. DISCUSSION

Having carefully considered Plaintiffs' unopposed motion in the context of the standards outlined above, the Court finds that the proposed settlement is fair and reasonable as to minors L.S. and J.S. Plaintiffs have disclosed the ages of the minors: L.S. is 14 years old; J.S. is 12 years old. See ECF No. 27-1, pg. 4. Plaintiffs have described the nature of the controversy: the wrongful death of the minors' biological father, John Swain. See id. at 4-10, 11-12. Plaintiffs' counsel has disclosed the nature of his representation of the minor plaintiffs and that he did not become involved in the case as the insistence of any party against whom a claim is asserted. See ECF No. 27-2, pg. 2. Plaintiffs' counsel has further represented that his representation proceeds pursuant to a retainer fee agreement whereby counsel would receive a contingency fee of 25% of any recovery on behalf of a minor plaintiff and 40% of any recovery on behalf of a decedent. See id. Plaintiffs' counsel has not, to date, received any compensation. See id.

Finally, the Court finds that the proposed settlement of the minors' claims for the amounts stated and as invested in annuities established for each minor plaintiff is fair and reasonable in light of settlements reached in similar cases. See, e.g., Estate of Johnson, 2026 U.S. Dist. LEXIS 3555 ($108,837.75 net payment, where minors' father overdosed and died in jail); Estate of Prince, 2025 U.S. Dist. LEXIS 164782 ($57,916.67 net payment, where minors' father overdosed and died in jail); Cantu v. Kings County, 2023 U.S. Dist. LEXIS 226837 (E.D. Cal. Dec. 20, 2023) ($19,092.75 net payment, where minor's father died in jail due to a seizure disorder that jail staff failed properly to monitor and treat), adopted, 2024 U.S. Dist. LEXIS 7787 (E.D. Cal., Jan. 12, 2024); Clines v. County of San Diego, 2022 U.S. Dist. LEXIS 205428 (S.D.

8

Cal. Nov. 10, 2022) ($9,441.50 net payment, where minor's father died in jail due to "fentanyl overdose"), adopted, K.C.A. v. County of San Diego, 2022 U.S. Dist. LEXIS 211074 (S.D. Cal. Nov. 21, 2022); Patino v. County of Merced, 2020 U.S. Dist. LEXIS 189668 (E.D. Cal. Oct. 13, 2020) ($47,513.67 net payments to two minors, where minors' father was misdiagnosed and died of treatable valley fever while in jail for three months), adopted, 2020 U.S. Dist. LEXIS 210517 (E.D. Cal. Nov. 10, 2020); E.R. v. County of Stanislaus, 2016 U.S. Dist. LEXIS 78787 (E.D. Cal. June 15, 2016) ($19,000 net payments to two minors, where minors' father died in jail by suicide after expressing suicidal ideation during a medical screening), adopted, 2016 U.S. Dist. LEXIS 97547 (E.D. Cal. July 25, 2016); Frary v. County of Marin, 2015 U.S. Dist. LEXIS 16229 (N.D. Cal. Feb. 10, 2015) ($92,305.48 net payment to minor, where minor's father overdosed and died in jail while staff failed to monitor him); Hagan v. Cal. Forensic Med. Grp., 2013 U.S. Dist. LEXIS 15637 (E.D. Cal. Feb. 5, 2013) ($50,000 payment after annuitization, where the minor's father was denied medical treatment and medications while incarcerated in jail and prison before he was eventually transferred to a hospital where he died), adopted, 2013 U.S. Dist. LEXIS 18865 (E.D. Cal. Feb. 11, 2013); Estate of Gautier v. Hickman, 2008 U.S. Dist. LEXIS 49794 (E.D. Cal. June 27, 2008) ($75,000 net payment, where minor's father was mistreated by medical staff in prison where he suffered multiple diabetic seizures and was in-and-out of a hypoglycemic coma for several months before he died).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

### III.  CONCLUSION

Accordingly, IT IS HEREBY ORDERED as follows:

1.    Plaintiffs' unopposed motion for approval of a minors' compromise, ECF No. 27, is GRANTED.

2.    The terms of the settlement as set forth in Plaintiffs' motion, including attorneys' fees, are APPROVED as fair and reasonable.

3.    To resolve the claims brought by minors L.S. and J.S., Defendants shall pay a total of $1,425,000.00, payable as follows:

      a.    $496,114.27 payable to MetLife Assignment Company, Inc., to fund the annuity for L.S.

      b.    $496,114.27 payable to MetLife Assignment Company, Inc., to fund the annuity for J.S.

      c.    $432,771.46 payable to the Law Offices of Mark E. Merin to pay attorneys' fees and costs for minors L.S. and J.S.

4.    Dispositional documents are due within 45 days of the date of payment of all settlement proceeds, including the amounts outlined above to fund the minors' annuities.

5.    All other dates and deadlines in this case are VACATED.

Dated:  April 2, 2026

_____
DENNIS M. COTA
UNITED STATES MAGISTRATE JUDGE

10